IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

SOUTHERN DIVISION

No. 7:21-CV-138

| | | |
|---|---|---|
| CAPE FEAR RIVER WATCH;<br><br>NORTH CAROLINA WILDLIFE FEDERATION;<br><br>DEFENDERS OF WILDLIFE;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS;<br><br>COLONEL BENJAMIN A. BENNETT, in his official capacity as U.S. ARMY CORPS OF ENGINEERS, WILMINGTON DISTRICT COMMANDER;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT**<br><br>Fed. R. Civ. P. 7 |

## <u>NATURE OF THE CASE</u>

1.      This case challenges the United States Army Corps of Engineers' (the "Corps")

decision to remove longstanding and successful seasonal restrictions on hopper dredging at

Wilmington and Morehead City Harbors in North Carolina without an adequate explanation and

based on a flawed and incomplete environmental review under the National Environmental

Policy Act.

1

2.     For decades, the Corps' official policy restricted maintenance hopper dredging activities at Wilmington and Morehead City Harbors to winter months. This policy protected endangered and threatened sea turtles, endangered sturgeon, and other sensitive fish species and fishery resources from being sucked into hopper dredges and maimed or killed.

3.     In an abrupt reversal to decades-old policy and practice, however, in February of this year, the Corps decided to eliminate the longstanding "dredging window" for North Carolina. With this decision, the Corps reversed its historic practice that limited dredging to winter months across the South Atlantic and instead allowed for maintenance hopper dredging in North Carolina harbors anytime of the year, including spring and summer months when many species vulnerable to hopper dredging activities are present.

4.     The Corps began acting on this decision this year by dredging the Wilmington and Morehead City Harbors in June and July. Based on publicly available data, the Corps' North Carolina dredging activities during these previously off-limits summer months has already killed at least three sea turtles. The Corps also attempted to hopper dredge in Georgia this summer before a federal court enjoined the activity.

5.     After the federal court enjoined spring and summer dredging in Georgia, the Corps announced that it would not hopper dredge during the spring and summer in Brunswick, Savannah, and Charleston Harbors, leaving North Carolina the only district covered by the Corps' Regional Harbor Dredging Contract to allow spring and summer dredging in Southeastern navigational channels.

6.     Plaintiffs bring this action seeking a declaration that the Corps violated the National Environmental Policy Act and the Administrative Procedure Act, by arbitrarily reversing agency policy without rational explanation, failing to prepare an Environmental Impact Statement, and inadequately assessing impacts and alternative actions. They further seek an order enjoining the Corps and its agents from proceeding with year-round hopper dredging unless and until the Corps conducts a legally sufficient environmental review under the National Environmental Policy Act.

## JURSDICTION AND VENUE

7.     This action arises under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. This Court therefore has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (action to compel a federal officer to do his duty), and it may issue a declaratory judgment and grant further relief pursuant to 28 U.S.C. §§ 2201–2202. The Conservation Groups are entitled to bring this action pursuant to the APA, 5 U.S.C. § 702.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district and Plaintiffs Cape Fear River Watch and North Carolina Wildlife Federation are based in this district.

## PARTIES AND STANDING

### Plaintiffs

9.     Plaintiff Cape Fear River Watch ("CFRW") is a member of the worldwide Waterkeeper Alliance and was founded in 1993 as a nonprofit organization dedicated to the improvement and preservation of the Cape Fear River Basin. CFRW is based in Wilmington,

3

North Carolina. CFRW has members across the state of North Carolina and many live in and around Wilmington, North Carolina.

10.     CFRW's mission is to protect and improve the water quality of the Cape Fear River Basin for all people through education, advocacy, and action. Through a variety of programs, CFRW provides its members, supporters, and the public with science-based information about the Cape Fear River Basin and the species in and around the Wilmington area.

11.     CFRW has members that visit, recreate, fish, photograph, study, conduct conservation efforts for, and otherwise enjoy aquatic wildlife and coastal resources present in Wilmington, North Carolina, who are likely to be harmed by the removal of dredging windows.

12.     CFRW and its members have been actively opposed to the Corps' decision to allow year-round hopper dredging at Wilmington and Morehead City Harbors. CFRW has participated in the NEPA process and submitted comments on the Corps' decision through counsel.

13.     Plaintiff North Carolina Wildlife Federation ("NCWF") is the state's oldest and largest statewide non-profit conservation organization. Since 1945, NCWF has worked with citizens, outdoor enthusiasts, hunters and anglers, government, and industry to safeguard North Carolina's natural resources. NCWF's mission is to protect and promote natural areas throughout the state—not only as habitat for native wildlife, but also as recreational, fishing, and wildlife observation areas for its dedicated and passionate members.

4

14.     NCWF is headquartered in Raleigh, North Carolina, and works on wildlife and habitat issues throughout the state. NCWF has over four dozen affiliates, thirteen chapters, and more than a 100,000 hunters, anglers, and wildlife enthusiasts subscribe to its Camo Coalition and Wildlife Action Network.

15.     NCWF works collectively to preserve wild places and species through policy and protection work, research, education, and direct hands-on conservation projects.

16.     NCWF has members who live in and visit the Wilmington and Morehead City areas. NCWF members visit, recreate, fish, observe wildlife, photograph, study, conduct conservation efforts for, and otherwise use and enjoy coastal resources in Wilmington and Morehead City, North Carolina, who are likely to be harmed by the removal of dredging windows.

17.     NCWF and its members have been actively opposed to the Corps' decision to allow year-round hopper dredging at Wilmington and Morehead City Harbors. NCWF has participated in the NEPA process and submitted comments on the Corps' decision through counsel.

18.     Plaintiff Defenders of Wildlife ("Defenders") is a national non-profit, membership organization founded in 1947. Defenders has more than 2.1 million members and supporters nationwide, including nearly 59,000 members and supporters in North Carolina.

19.     Defenders is dedicated to the protection and restoration of all native wild animals and plants in their natural communities, and the preservation of the habitats on which these species depend. Defenders advocates for innovative approaches to wildlife conservation that will help prevent species from becoming endangered, using education, litigation, research, legislation, and advocacy to defend wildlife and habitats. Headquartered in Washington, DC,

5

Defenders has regional field offices around the country, including a regional office for the Southeastern United States in Asheville, North Carolina. Defenders has a long history of advocating for imperiled species found in the Southeastern United States, such as sea turtles and sturgeon that are protected under the Endangered Species Act, 16 U.S.C. §§ 1531–1544.

20.     Defenders has members who live near, visit, recreate, fish, photograph, participate in conservation efforts for, and otherwise use and enjoy the coastal resources present in Wilmington and Morehead City, North Carolina who are likely to be harmed by the removal of dredging windows.

21.     Defenders and its members have been actively opposed to the Corps' decision to allow year-round hopper dredging at Wilmington and Morehead City Harbors. Defenders has participated in the NEPA process and submitted comments on the Corps' decision through counsel.

22.     Collectively, all plaintiffs are referred to as the "Conservation Groups."

23.     The Corps' removal of dredging windows already has and will continue to harm and kill wildlife, including threatened and endangered turtles and sturgeon, as well as directly and indirectly harm habitat and other fisheries resources in and around Wilmington and Morehead City Harbors. The Corps' reversal in agency policy and practice that removes longstanding dredging windows without a rational reason as required by the APA and the Corps' failure to prepare a full Environmental Impact Statement as required by NEPA will thereby directly, adversely, and irreparably injure the Conservation Groups and their members and staff.

**Defendants**

24.     Defendant U.S. Army Corps of Engineers is an agency of the United States. The Corps is the federal agency responsible for compliance with federal and state law for its civil works projects, including the maintenance dredging of Wilmington and Morehead City Harbors.

25.     Defendant Colonel Bennett is the District Commander for the U.S. Army Corps of Engineers, Wilmington District and is sued in his official capacity. Colonel Bennett has decision-making authority and is responsible for ensuring compliance with federal and state law related to the NEPA analysis at issue in this case. "The district commander is the Corps NEPA official responsible for compliance with NEPA for actions within district boundaries." 33 C.F.R. § 230.5. Colonel Bennett signed the Finding of No Significant Impact challenged in this case.

26.     Collectively all Defendants are referred to as "the Corps."

## FEDERAL STATUTORY AND REGULATORY BACKGROUND

### National Environmental Policy Act

27.     The purpose of NEPA is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321.

28.     NEPA demands a federal agency use "all practicable means and measures" to thoughtfully analyze the proposed action and inform the agency's decision-making. *Id.* §§ 4331(a), 4332(C).

29.     To implement the requirements of the statute, the Council on Environmental Quality ("CEQ") first promulgated NEPA regulations applicable to all federal agencies in 1978. *See* 40 C.F.R. §§ 1500–1508 (1978).

30.     In July 2020, the previous administration promulgated regulations significantly altering the 1978 regulations. *See* Update to the Regulations Implementing the Procedural

7

Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). The new regulations apply to "any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13 (2020). The new regulations also gave federal agencies the discretion to apply the 1978 or the 2020 NEPA regulations to any ongoing activities or environmental documents begun before September 14, 2020. *Id.*

31.     Here, the applicable NEPA regulations are the longstanding 1978 version because the Corps initiated its NEPA analysis applying the 1978 regulations before the new CEQ regulations took effect, and the agency determined it would complete its analysis under the 1978 regulations as well.

32.     In addition to the CEQ NEPA regulations, the Corps has promulgated its own agency-specific regulations for implementing NEPA for projects that fall under its jurisdiction. 33 C.F.R. §§ 230.1–230.26.

33.     NEPA is a tool used to assess impacts of a proposed action, "rather than justify[] decisions already made." 40 C.F.R. § 1502.2(g) (1978).

34.     NEPA further requires that every NEPA analysis be prepared with objective good faith and must fully and fairly discuss, among other things, the alternatives to the proposed action that may avoid or minimize these adverse effects. 42 U.S.C. § 4332(C), (E).

35.     To that end, NEPA requires federal agencies to "study, develop, and describe appropriate alternatives" to the agency's proposed course of action. *Id.* § 4332(E), *see also id.* § 4332(C)(iii); 40 C.F.R. § 1508.9(b) (1978).

36.     NEPA requires that federal agencies prepare a "detailed" and thorough Environmental Impact Statement ("EIS") before undertaking a major action that would significantly affect the quality of the human environment. 42 U.S.C. § 4332(C).

37.     The EIS requirement serves both internal and external functions. Internally, preparing an EIS ensures that the agency takes a hard look at the direct, indirect, and cumulative environmental impacts of the proposed action. It also guarantees that the agency will consider a range of reasonable alternatives to accomplish the underlying goals of the proposed action—including options that may have fewer adverse impacts on the environment—before deciding whether to undertake the project as originally proposed. The alternatives considered must include a "no action" alternative. Externally, the EIS provides detailed public information about the proposed action, its impacts, and reasonable alternatives, so that the public and other government agencies may be informed participants in the decision-making process.

38.      To determine whether the agency must prepare an EIS, NEPA regulations instruct agencies to decide first whether the action is one that normally requires an EIS. 40 C.F.R. § 1501.4(a)(1) (1978). The Corps' NEPA regulations list certain activities that "normally require[e] an EIS," including "[p]roposed major changes in the operation and/or maintenance of completed projects." 33. C.F.R. § 230.6(c).

39.     If a proposed action does not normally require an EIS, an agency must prepare an environmental assessment ("EA") to determine if the action is "significant" and thus requires an EIS. 40 C.F.R. § 1501.4(b) (1978).

40.     The agency must look at the context and intensity of the proposed action in order to determine if it is "significant." *Id.* § 1508.27 (1978).

9

41. The significance of an action "varies with the setting," and the context includes the locality, the region, and "society as a whole." 40 C.F.R. § 1508.27(a) (1978). Intensity of an action refers to the "severity of impact." *Id.* § 1508.27(b) (1978). The NEPA regulations detail ten "intensity factors," any one of which makes an action "significant" so as to warrant preparation of an EIS. These factors include, among others:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
>
> . . .
>
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
>
> . . .
>
> (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
>
> . . .
>
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
>
> *Id.* § 1508.27(b) (1978).

42. When determining the scope of the environmental analysis, agencies must consider connected and cumulative actions. *Id.* § 1508.25 (1978).

43. The NEPA regulations define connected actions as actions that "are closely related" and must therefore be considered in the same environmental analysis. *Id.*

10

§ 1508.25(a)(1) (1978). Actions are connected if they "[a]re interdependent parts of a larger action and depend on the larger action for their justification. *Id.* § 1508.25(a)(1)(iii) (1978).

44.     The NEPA regulations define cumulative actions as those that "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (1978).

45.     The "effects" of the various project alternatives that must be discussed in a NEPA review include direct, indirect, and cumulative effects.  *Id.* §§ 1502.16, 1508.7 (1978).

46.     NEPA regulations define direct effects as those effects that "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a) (1978).

47.     NEPA regulations define indirect effects as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (1978).

48.     NEPA regulations define cumulative effects as those "which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7 (1978).

49.     All NEPA analyses must be based on "high quality" information.  *Id.* § 1500.1(b) (1978). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

### Administrative Procedure Act

50.     Because NEPA does not contain an internal citizen suit provision, the APA governs the scope and standard of review of the Conservation Groups' NEPA claims against the Corps.

11

51.　　The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

52.　　The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of the procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

53.　　An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

54.　　Additionally, while "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

## **FACTS**

55.　　This case challenges the Corps' decision to remove longstanding seasonal restrictions on hopper dredging in federally-maintained harbors and navigational channels in North Carolina. The removal of these moratoria or "windows" allows the Corps to use hopper dredges year-round.

56.     After several sea turtles were killed during maintenance dredging at Morehead City Harbor in the late 1990s, the Wilmington District of the Corps adopted a policy implementing a dredging window of January through March for Wilmington and Morehead City Harbors.

57.     Since that time, the Corps has continued to implement dredging windows for Wilmington and Morehead City Harbors to protect threatened and endangered species, essential fish habitat, important fisheries, and other natural resources.

58.     In an abrupt reversal in decades of policy and practice, however, the Corps now intends to allow hopper dredging year-round at Wilmington and Morehead City Harbors, including during the height of turtle nesting season and times of year when many fish are in young sensitive life stages.

59.     Based on information and belief, this summer, the Corps performed maintenance dredging with hopper dredges at Wilmington and Morehead City Harbors in North Carolina with documented turtle deaths.

60.     Maintenance dredging has been conducted at Wilmington and Morehead City Harbors as often as every year. Maintenance dredging consists of the periodic removal of shoaled sediments from the navigational channel in order to maintain a specified depth.

61.     For the past four years, the Corps has entered into an annual regional contract, the Regional Harbor Dredging Contract, to cover maintenance dredging in the Wilmington, Charleston, and Savannah Districts.

**Environmental Impacts of Hopper Dredging**

62.     Although there are multiple dredging methods available to the Corps for maintaining navigational channels, the Corps often prefers hopper dredges.

13

63.     Hopper dredges are massive vessels that operate like a vacuum cleaner. Each dredge contains one or more pipes that "suck" up the bottom sediment and discharge it into a holding area or "hopper" within the vessel until disposal.

64.     Hopper dredging poses a unique and often fatal risk to aquatic wildlife. The suction pipes on a hopper dredge are incredibly large and powerful, sucking sediment through a nearly 2-foot-wide pipe at a force up to 10,000 hp (7,460kW). With this force, the dredge can, and often does, pull up fish, sea turtles, and other organisms. Due to the size of the pipe and the force of the pump, the species can easily become trapped in a process known as entrainment.

65.     Entrainment can cause massive blunt force trauma to an animal, including fractures, crushed organs, and hemorrhages. More often than not, entrainment will kill the animal. The forced passage through the suction pipe can pulverize aquatic life beyond recognition.

66.     Sea turtles and fish that are entrained in hopper dredging equipment are killed or maimed by the sheer blunt force trauma associated with being forcefully sucked through the pipes and inside the hopper dredge itself. Animals that are not killed immediately often suffer internal trauma, increasing their risk for subsequent death.

*Sea Turtle Impacts*

67.     Hopper dredges pose a particular risk to sea turtles. Sea turtles entrained in hopper dredges are usually killed. Sea turtles maimed or killed by hopper dredges experience cracked or fractured shells, hemorrhages, bleeding and even disembodiment.

68.     The death of a sea turtle by a hopper dredge is particularly concerning because most sea turtle species do not reach sexual maturity until 20–30 years old. The death of an adult or juvenile female sea turtle, and the corresponding loss of that animal's

14

lifetime reproductive capacity, can have long-term population impacts that are not realized for decades. Because of delayed sexual maturity, the death or maiming of a reproductive female during the spring and summer months is particularly detrimental to population recovery.

69.     It is rare for sea turtles to survive entrainment, but when they do, they often suffer additional injuries that impede full recovery and make subsequent mortality more likely. For example, sea turtles can experience gas embolisms—gas bubbles in the blood and tissues created by forced submergence through different water pressures—that complicate recovery and make survival unlikely.

70.     Hopper dredging in the spring and summer months is especially harmful to sea turtles, because more sea turtles overall are present when the water temperature is higher, and nesting females in particular are present during these months as they approach beaches to nest. Nesting female sea turtles have to swim past the hopper dredges to reach the beaches and return to open water, placing them at risk of entrainment or other sub-lethal impacts.

71.     During the spring and summer months, five different species of Endangered Species Act-listed sea turtles—hawksbill, leatherback, loggerhead, green, and Kemp's ridley—travel to North Carolina's coast for breeding and nesting. During these months, beaches surrounding Wilmington and Morehead City Harbors are likely to host hundreds of sea turtles laying nests.

72.     Biologists have recognized the dangers of hopper dredging to sea turtles since at least 1980, when more than 70 turtles were killed or injured by hopper dredges between July and November in Canaveral Channel, Florida.

73.     For the next decade, hundreds of sea turtle deaths occurred as a result of hopper dredging throughout Southeast channels.

74.     The number of deaths may be a substantial underestimate because the probability of finding a turtle after injury or mortality does not usually exceed 20%.

75.     Because of the negative impacts on sea turtles, hopper dredge operations often use relocation trawling as a mitigation measure. Relocation trawling consists of large nets being dragged through waters where turtles are expected to be in advance of a dredging operation. But sea turtles are also threatened by the relocation trawling because it results in turtles being dragged over vast expanses and leads to drowning, post interaction mortality, loss of egg clutches, and harmful stress to adult female turtles.

76.     Other obstacles associated with hopper dredging, such as buoys, pose threats to sea turtles, which can easily get caught and trapped in buoy lines.

*Fish Impacts*

77.     Hopper dredges also pose significant risks to fish and fishery resources during the spring and summer months.

78.     Endangered Atlantic and shortnose sturgeon present in Wilmington and Morehead City Harbors during the spring and summer months are at risk of fatal entrainment in the hopper dredge because these fish must swim through and near the project area to travel between the estuaries and open water.

79.     The lower Cape Fear River, within the Wilmington Harbor project area, is designated as critical habitat under the Endangered Species Act for Atlantic sturgeon.

80.     Atlantic and shortnose sturgeon travel up the Cape Fear River to spawn, and both juvenile and adult Atlantic sturgeon are present in the lower Cape Fear River and the Northeast Cape Fear River during different times of the year. Juvenile sturgeon will have to pass the hopper dredges in order to reach the open ocean putting them at risk of entrainment.

16

81.     Hopper dredging also poses significant risks to commercially and recreationally important fish species and fish habitat. Smaller species of fish are crushed by dredging operations, so much so that the biological debris is often difficult to identify as a particular species.

82.     During the spring and summer months hopper dredging impacts to fish are exacerbated, as many fish species pass through inlets into estuaries in and around Wilmington and Morehead City Harbors during these months. These species spawn offshore, and then in spring and early summer, the juvenile fish mature in the estuary, in a process known as recruitment. Thus, fish that are in vulnerable life stages are present during spring and summer months.

83.     The project area contains Essential Fish Habitat and Habitat Areas of Particular Concern designated under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1884. These areas are so designated because they provide important ecological functions for federally managed species, including nursery areas and spawning sanctuaries. These protected areas are vital for successful fish spawning, breeding, feeding, and growth during the summer months.

84.     Hopper dredging increases sedimentation in the water and reduces dissolved oxygen levels, threatening the integrity of fish habitat. Reduced levels of dissolved oxygen can disrupt spawning, breeding, and growth activities. Because of this environmental degradation, hopper dredging threatens estuarine recruitment of larval and juvenile fish. Larvae of estuarine-dependent species are highly sensitive to changes in environment, making the impacts of hopper dredges significantly more adverse to young fish.

17

85.     Hopper dredging also disturbs the stability of the benthic environment and the resulting sedimentation can smother and kill organisms that live on the bottom of the waterbody. The benthic environment supports lower trophic level organisms, a critical food source for commercially and recreationally important fish species in and around Wilmington and Morehead City Harbors.

**Decades-Old Dredging Windows**

86.     In recognition of hopper dredging's known harms to sea turtles, fish, and other sensitive species, the Corps historically agreed to perform all hopper dredging activities in the South Atlantic in the winter months, when fewer vulnerable species are present in southeast channels and harbors.

87.     Since the 1990s, other federal and state agencies tasked with protecting natural resources have also long required hopper dredging operations to take place outside of spring and summer months all across the South Atlantic, for example, through biological opinions prepared under the Endangered Species Act, 16 U.S.C 1536(a)(2), consistency determinations prepared under the Coastal Zone Management Act, 16 U.S.C. § 1456(c), and Clean Water Act section 401 certifications, 33 U.S.C. § 1341(a).

88.     Implementation of dredging windows prohibiting spring and summer dredging has been the most effective way to avoid and minimize impacts to aquatic species during hopper dredging events.

89.     Other mitigation measures, such as relocation trawling, are often ineffective and can harm animals by forcefully dragging them through the water.

90.     National Marine Fisheries Service biologists have raised to the Corps that dredging windows are the most effective avoidance and mitigation measure.

18

91.     In 1997, the Corps' South Atlantic Division adopted its own hopper dredging protocol to reduce harm to threatened and endangered species.

92.     While the exact window dates have varied, up until this year the Wilmington District has abided by a self-imposed policy of dredging windows at Wilmington and Morehead City Harbors to limit hopper dredging to winter months. Most recently, the Corps adhered to a window of December 1 to April 15 during which hopper dredging was allowed to occur.

### The Corps' NEPA Process

93.     On April 8, 2020, the Corps issued a Scoping Notice for the proposal to remove its self-imposed hopper dredging windows in Wilmington and Morehead City Harbors and allow year-round maintenance dredging at these harbors.

94.     During the scoping comment period, multiple agencies and resource organizations submitted comments.

95.     The North Carolina Department of Environmental Quality raised concerns about fish and water quality impacts associated with spring and summer dredging, as well as emphasized that historically, the Corps and state agencies had worked together to maintain the channels while also protecting natural resources without spring and summer dredging.

96.     The North Carolina Wildlife Resources Commission commented that the Corps should acknowledge the detrimental impacts of hopper dredging during the summer, the effectiveness of dredging windows in preventing those impacts, and the increase in costly and much less effective mitigation measures that would be necessary in order to protect fish and sea turtles present during the summer.

97.     On August 5, 2020, the Corps solicited bids for the Regional Harbor Dredging Contract for the 2021 dredging period on the assumption that environmental dredging windows

19

would not apply. This was prior to the release of any NEPA analysis regarding the removal of dredging windows.

98.     On August 19, 2020, the Corps issued a public notice and a Draft EA explaining its proposal to remove the agency's self-imposed dredging window.

99.     The Corps' purpose and need statement incorrectly stated that the Wilmington District was the only district included in the Regional Harbor Dredging Contract that was restricted by environmental windows.

100.    On September 15, 2020, the 30-day public comment period for the Draft EA was extended until October 2, 2020.

101.    On September 23, 2020, before the close of the public comment period on the Draft EA, the Corps awarded the Regional Harbor Dredging Contract to Great Lakes Dredge & Dock Company.

102.    Multiple groups and resource agencies again submitted comments on the Draft EA.

103.    The National Marine Fisheries Service commented that the Draft EA was incomplete because it failed to adequately discuss the historic and long-standing use of environmental windows in North Carolina and in other Corps districts, failed to acknowledge the effectiveness of environmental windows in protecting species and habitat, and failed to discuss other ways of adaptively managing species protection outside of removing the dredging window.

104.    The North Carolina Wildlife Resources Commission comments supported the use of a dredging window, critiqued the impact analysis presented in the Draft EA,

and raised concerns about the cumulative impacts associated with removing dredging windows in other projects.

105. The South Atlantic Fishery Management Council commented that the Draft EA failed to analyze Essential Fish Habitat and Habitat Areas of Particular Concern that are present in the project areas. It supported the use of the historic hopper dredging windows and requested the Corps to explore additional alternatives to removing these windows.

106. The Southern Environmental Law Center commented on behalf of the Conservation Groups that the Draft EA contained a faulty impacts analysis, put forth an unreasonable range of alternatives, failed to consider cumulative impacts associated with the proposed expansion of Wilmington Harbor, and was completed in the face of a premature bid solicitation and contract award, among other flaws. The comments urged the Corps to prepare a full EIS to adequately analyze these and other impacts, as required by NEPA.

107. In tandem with the Draft EA review, the North Carolina Division of Coastal Management ("DCM") evaluated the Corps' proposal to eliminate dredging windows in order to determine if such a decision was consistent with the state's coastal management plan.

108. During DCM's own public comment period regarding consistency with the state's coastal management plan, resource agencies and the public, including the Conservation Groups, raised significant concerns about impacts to sea turtles, fish and fish habitat, and water quality.

109. On December 23, 2020, the Corps requested that DCM issue a consistency concurrence for the first three years of removing dredging windows, committing to conducting limited monitoring during that timeframe. On December 31, 2020, DCM found the removal of dredging windows for three years with limited monitoring consistent with the state's coastal policies.

110.     Following the consistency concurrence, on January 27, 2021, the Conservation Groups submitted supplemental comments to the Corps reiterating their previous concerns, including the need for a full EIS, as well as new concerns that the Corps had adopted the new three-year monitoring proposal with the intent to simply continue operating without dredging windows after the end of the three years.

111.     On February 11, 2021, DCM hosted a virtual meeting between the Corps, the Conservation Groups, and multiple resource agencies.

112.     At the meeting, state agency staff and the Conservation Groups highlighted that significant concerns regarding the Corps' proposal remained, despite the monitoring commitments made during the consistency process.

113.     During this meeting, the Corps stated that its proposal to remove the hopper dredging window in Wilmington and Morehead City Harbors was part of a "paradigm shift" in how the agency plans to address dredging impacts across the Southeast.

114.     A Corps official acknowledged that the agency was reevaluating the use of environmental windows—for all dredging *and* non-dredging projects—with the intent to eliminate the longstanding practice.

115.     On February 17, 2021, the Conservation Groups submitted a second set of supplemental comments to the Corps stating that the consistency concurrence did not resolve previously-identified legal deficiencies with the Corps' proposal. The Conservation Groups also raised concerns about the Corps' failure to disclose or analyze its so-called paradigm shift to eliminate environmental windows throughout the Southeast.

22

### The Corps' Final EA and Finding of No Significant Impact

116.     On February 25, 2021, the Corps issued its Finding of No Significant Impact ("FONSI") selecting the complete elimination of the hopper dredging window in North Carolina as the Corps' action.

117.     The Corps also released a Final EA accompanying the FONSI. The purpose articulated in the Final EA was to increase flexibility in maintaining the Wilmington and Morehead City entrance channel areas while abiding by laws governing the Corps' dredging activities.

118.     The Final EA included the same three alternatives listed in the Draft EA: (1) no action, (2) the expansion of the dredging window, and (3) the complete elimination of the dredging window.

119.     The Final EA identified the elimination of the hopper dredging window as the agency's preferred alternative.

120.     The Final EA concluded that the only other analyzed action alternative, the expanded window alternative, "does not meet the purpose and need" because it did not provide the "[m]aximum flexibility…needed to reduce risks associated with hopper dredge availability."

121.     The Corps' purpose and need does not include a need for "maximum flexibility."

122.     The Final EA also does not analyze the full scope of impacts corresponding with the Corps' decision to allow year-round dredging.

123.     The Final EA concludes that known water quality impacts will be insignificant based on the unexplained assumption that water quality impacts will be temporary. The Final EA does not compare how impacts to water quality would differ during different seasons.

124. The Final EA does not discuss the full scope of impacts from regular, annual spring and summer dredging to fish and aquatic species populations that must travel through the channels to reach estuaries during those times for recruitment, feeding, or breeding.

125. The Final EA concludes that impacts to fisheries are insignificant by deeming them temporary, despite acknowledging that "[t]wice as many important fishery species are present during the spring months of April – June" as compared to the late summer and fall months and that water quality impacts will have effects on the fisheries present.

126. The Final EA concludes that impacts to Essential Fish Habitat and Habitat Areas of Particular Concern are insignificant based on an unexplained assumption that species will simply leave affected areas during hopper dredging events and relying upon the comparison that impacts "would be minor when considering the vastness of habitat in the ocean."

127. The Final EA concludes that impacts to endangered Atlantic sturgeon will be insignificant despite acknowledging that early spring through June are considered periods of highest risk for migrating and early life stages of anadromous fish, including the endangered Atlantic sturgeon, and finding that "[d]redging during spring and fall migrations can increase the numbers of lethal takes of Atlantic sturgeon."

128. Similarly, the Final EA concludes that impacts to endangered sea turtles are insignificant despite acknowledging the presence of five endangered and threatened sea turtle species and finding that "[s]ea turtles present within the project area, especially

loggerheads and greens, are at risk of impingement and entrainment within the hopper dredge."

129.     The Final EA does not discuss harmful impacts to sea turtles caused by relocation trawling.

130.     The Final EA does not discuss the effectiveness of dredging windows in preventing detrimental impacts to sea turtles and other aquatic life.

131.     The Final EA includes turtle take numbers only from the most recent five years, and does not include any information about non-fatal take numbers for those years.

132.     The fatal turtle take data presented in the Final EA show that every take recorded for 2020 occurred outside the traditional dredging window.

133.     The Final EA did not consider the possibility of dredge material being repurposed for beach fill activities, and the consequent impacts to beach communities, shorebirds, and benthic habitat. Instead, the Final EA states that dredging and beach placement demand might increase "as more and more federal and non-federal beach projects get underway," but it ultimately dismisses, without justification, any discussion about possible cumulative effects associated with such increased demand because the impacts of increased nourishment are "not considered as part of this EA."

134.     The Final EA states "[t]he Port of Wilmington has modernized to handle larger vessels and has completed a feasibility study to increase the harbor channel depth an additional 5 feet to accommodate future growth." The Final EA does not assess cumulative and interrelated impacts resulting from the decision to remove the dredging window in combination with the possibility of maintaining a deeper and larger harbor.

135.     The Final EA did not include alternatives in its comparison of alternatives that would meet the purpose and need of the project, including those outside the Wilmington

25

District's immediate control, such as utilizing other types of dredges, breaking away from the Regional Harbor Dredging Contract, and expanding its own fleet of hopper dredges so that the agency is not reliant upon industry availability.

136.    The Final EA did not consider the connected and cumulative actions or impacts, including impacts to sea turtle and fish species that occur across the South Atlantic, associated with removing dredging windows across neighboring Corps districts, such as in the Charleston and Savannah Districts.

137.    The Final EA does not mention, much less analyze, the compounding impacts climate change will have on species, water quality, water temperatures, or the affected project area.

138.    Ultimately, the Final EA formalizes the Corps' "paradigm shift" explaining that the Corps will now be utilizing a "risk-based approach going forward for all Districts," rather than longstanding windows, when carrying out its civil works projects.

139.    In March 2021, the Corps announced that it intended to solicit bids for the FY 2022 Regional Harbor Dredging Contract without environmental windows for *any* of the covered harbors.

**The Corps' Spring and Summer 2021 Dredging Season**

140.    This year the Corps intended to complete maintenance hopper dredging in Wilmington and Morehead City in North Carolina, as well as Brunswick and Savannah Harbors in Georgia between the months of May and July 2021.

141.    Based on information and belief, the Corps conducted maintenance dredging with a hopper dredge in Morehead City Harbor in late May 2021.

142. Based on information and belief, the Corps conducted maintenance dredging with a hopper dredge in Wilmington Harbor in late June 2021.

143. Based on information and belief, during the course of dredging Morehead City Harbor, the Corps recorded three fatal sea turtle takes. In addition, three more turtles were captured and relocated during dredging operations.

144. The Savannah District originally planned to dredge in Brunswick Harbor between June and July of this year. In May, a federal judge in the Southern District of Georgia halted the Corps' plans and required the Corps to adhere to the traditional hopper dredging window for the Harbor. *One Hundred Miles v. U.S. Army Corps of Eng'rs*, 4:21-cv-00134-RSB-CLR (May 24, 2021) (transcript of oral order).

145. After the court's order prohibiting summer dredging in Brunswick Harbor, the Savannah District released a Draft EA analyzing the permanent removal of the seasonal hopper dredging window in Brunswick Harbor. The Corps held a public comment period on the proposal which ended on July 21, 2021. State and federal agencies, as well as environmental organizations, submitted comments opposing the removal of the dredging windows or calling for additional review.

146. The Savannah District also initially planned to dredge Savannah Harbor during spring and summer 2021 but announced in July 2021 that it would continue to abide by the traditional environmental windows going forward for Savannah Harbor.

147. On July 19, 2021, the Corps released a bid solicitation for the FY 2022 Regional Harbor Dredging Contract indicating that dredging windows will restrict dredging activities in Savannah Harbor, Brunswick Harbor, and Charleston Harbor to the winter months. For those

27

harbors, dredging must occur between December 15 and March 31. The bid solicitation does not impose dredging windows for Wilmington and Morehead City Harbors.

148.    The Corps plans to perform hopper dredging at Wilmington and Morehead City Harbors without any seasonal restrictions in FY 2022, while simultaneously stating it will abide by historic dredging windows at Brunswick, Savannah, and Charleston Harbors.

## FIRST CLAIM FOR RELIEF

**APA Violation: Arbitrary and Capricious Reversal in Agency Policy and Practice**

149.    The Conservation Groups incorporate by reference the allegations of paragraphs 1–148 as if set forth in full.

150.    The Corps' decision to reverse its longstanding policy imposing dredging windows by allowing year-round hopper maintenance dredging in Wilmington and Morehead City Harbors is a final agency action within the meaning of the APA.

151.    The Corps has failed to explain why the reasons and facts supporting the Corps' decades-old policy requiring hopper dredging operations to occur in the winter months at Wilmington and Morehead City Harbors so as to avoid harm and deaths of wildlife no longer apply.

152.    Instead, the Corps has reversed decades-old policy without adequate explanation to now allow dredging to occur during the spring and summer when large numbers of sea turtles and other aquatic life have historically been killed and maimed.

153.    In making the challenged decision, the Corps acted in a manner that was arbitrary, capricious, an abuse of discretion and not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### NEPA Violation: Failure to Prepare an EIS

154.　The Conservation Groups incorporate by reference the allegations of paragraphs 1–148 as if set forth in full.

155.　The Corps' abandonment of dredging windows at Wilmington and Morehead City Harbors is a major federal action significantly impacting the quality of the human environment.

156.　The context and intensity of the action of eliminating these dredging windows require the preparation of a full EIS under NEPA.

157.　The Corps' decision to eliminate the dredging window and allow year-round hopper dredging implicates multiple intensity factors under the CEQ regulations, any one of which is sufficient to trigger the requirement to prepare an EIS, including but not limited to that the decision affects endangered and threated species and habitat, establishes a precedent for other actions, corresponds to cumulatively significant impacts, is highly controversial, and affects unique characteristics of the area. 40 C.F.R. § 1508.27(b) (1978).

158.　Under the Corps' agency-specific NEPA regulations, the removal of the historic dredging window is a "[p]roposed major change[] in the operation and/or maintenance of completed projects," and thus, because of the significant impacts mentioned above and the Corps' NEPA regulations, the agency was required to prepare an EIS. 33 C.F.R. § 230.6(c), 40 C.F.R. § 1508.27(b) (1978).

159.　The Corps' failure to prepare an EIS in light of the multiple significance factors under the CEQ regulations and its own regulations violated NEPA and was arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(C).

160.    To the extent the Corps is implementing a paradigm shift and intends to remove dredging windows all across the South Atlantic Division, the Corps has failed to evaluate such a major federal action in an EIS considering the regional impacts of such a decision. The failure to prepare an EIS considering the full scope of the action and consequent impacts was arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(C).

## THIRD CLAIM FOR RELIEF

### NEPA Violation: Arbitrary and Capricious Impacts Analysis

161.    The Conservation Groups incorporate by reference the allegations of paragraphs 1–148 as if set forth in full.

162.    The Corps failed to adequately assess or disclose the direct, indirect, and cumulative effects of eliminating the longstanding dredging window as required under NEPA, including but not limited to its insufficient analysis of sea turtle impacts, fishery impacts, water quality impacts, benthic habitat impacts, climate change impacts, and impacts from other related projects and actions.

163.    The Corps' analysis of direct, indirect, and cumulative impacts violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332.

## FOURTH CLAIM FOR RELIEF

### NEPA Violation: Arbitrary and Capricious Alternatives Analysis

164.    The Conservation Groups incorporate by reference the allegations of paragraphs 1–148 as if set forth in full.

165.    The Corps failed to objectively evaluate a range of reasonable alternatives to increase flexibility in maintaining Wilmington and Morehead City Harbors by failing

to consider other reasonable alternatives that would meet the purpose and need, by failing to assess the alternatives with objective good faith as required by NEPA, and by predetermining the outcome of the NEPA analysis.

166.    The Corps' analysis of alternatives violated NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332.

## PRAYER FOR RELIEF

WHEREFORE, the Conservation Groups respectfully request that this Court:

A.  Issue a declaratory judgment stating that the Corps has violated the APA and NEPA in the respects set forth above;

B.  Order that the Final EA and FONSI dated February 25, 2021 be vacated and set aside;

C.  Grant appropriate injunctive relief;

D.  Award the Conservation Groups the costs of this action, including their reasonable attorneys' fees; and

E.  Grant the Conservation Groups such further and additional relief as the Court deems just and proper.


This the 4th day of August, 2021.

/s/ Ramona H. McGee
Ramona H. McGee
rmcgee@selcnc.org
N.C. Bar No. 47935
Sierra B. Weaver
sweaver@selcnc.org
N.C. Bar No. 28340
Hannah M. Nelson
hnelson@selcnc.org
N.C. Bar No. 56565

31

SOUTHERN ENVIRONMENTAL LAW CENTER
601 W. Rosemary Street
Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
Attorneys for Plaintiffs