IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:21-CV-138-FL

| | | |
|---|---|---|
| CAPE FEAR RIVER WATCH, DEFENDERS OF WILDLIFE, and NORTH CAROLINA WILDLIFE FEDERATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| UNITED STATES ARMY CORPS OF ENGINEERS and BENJAMIN A. BENNETT, Colonel, in his official capacity as U.S. Army Corps of Engineers, Wilmington District Commander, | ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on the parties' cross-motions for summary judgment (DE 47, 49), and plaintiffs' motion to complete or supplement the administrative record (DE 53). The issues raised are ripe for ruling. For the following reasons, plaintiffs' motion for summary judgment is granted and the remaining motions are denied.

## STATEMENT OF THE CASE

Plaintiffs, non-profit conservation groups, commenced this action August 4, 2021, seeking judicial review of a decision by defendants (the "decision") regarding elimination of seasonal restrictions on dredging in harbors at Wilmington and Morehead City, North Carolina. Plaintiffs assert claims challenging the decision under the Administrative Procedure Act ("APA"),[1] 5 U.S.C.

---

[1] The court has appended to this order a glossary of acronyms and other shorthand terms used in this order.

§§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. Plaintiffs seek an order vacating and setting aside the decision, declaring that it is in violation of those statutes, granting appropriate injunctive relief, and awarding costs and fees.

Defendants filed the administrative record on November 15, 2021, and a supplement thereto on January 7, 2022, comprising: 1) the decision, 2) prior decisions and other documents referenced in the decision, 3) correspondence between defendants and plaintiffs, other governmental agencies, and other entities, transmitting comments and responses thereto to defendants' drafts and proposals preceding the decision, 4) internal documents, reports, correspondence, memoranda, meeting agendas and notes of defendants and other government agencies, 5) articles, studies, biological opinions, and notices, and 6) proposals, bids, offers, awards, and other dredging contract documentation.

Plaintiffs then filed their motion for summary judgment, relying upon the administrative record and declaration of Ramona H. McGee, counsel for plaintiffs, with additional articles not filed with the administrative record,[2] as well as additional declarations of officers and employees of plaintiffs. Plaintiffs also rely upon a transcript of a May 20, 2021, hearing on motion for preliminary injunction, in the case <u>One Hundred Miles v. United States Corps of Engineers</u>, Case No. 4:21-CV-134 (S.D. Ga.). Defendants' cross-motion for summary judgment places reliance upon the administrative record.

Plaintiffs filed the instant motion to complete or supplement the administrative record, with reference to declaration of Hanna M. Nelson, counsel for plaintiffs, including correspondence

---

[2]     Defendants referenced these articles in their index to the administrative record, but did not file them because they were "copyrighted materials." (DE 16-1 at 3). According to plaintiffs, the parties subsequently agreed that plaintiffs could file the documents for the court's convenience in reviewing plaintiffs' memorandum of law in support of summary judgment. (McGee Decl. (DE 48-1) at 2-3). Throughout this order, unless otherwise specified, page numbers in citations to documents in the record, other than the administrative record, specify page numbers supplied by the court's electronic case filing system and not the page numbers, if any, showing on the face of the document.

2

between plaintiffs and defendants, as well as internal correspondence and meeting notes by employees of defendant United States Army Corps of Engineers ("Corps"). All motions have been briefed fully. In the meantime, on April 4, 2022, and May 6, 2022, defendants filed notices of anticipated dredging schedule, with reference to declarations of Rosalind M. Shoemaker ("Shoemaker"), employee of defendants.

## STATUTORY AND REGULATORY FRAMEWORK

To provide context to the court's statement of facts, the court first sets forth a summary of the statutory and regulatory framework under NEPA.

NEPA requires all federal government agencies to "include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332. "The statement that this section requires" is an "environmental impact statement," commonly referenced as an "EIS." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 184 (4th Cir. 2005).[3]

"An agency is not required to prepare a full EIS if it determines—based on a shorter environmental assessment ('EA')—that the proposed action will not have a significant impact on the environment." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 16 (2008). An EA is "a document containing sufficient evidence and analysis to 'determin[e] whether to prepare an [EIS] or a finding of no significant impact,'" commonly referenced as a "FONSI." State of S.C. ex rel. Campbell v. O'Leary, 64 F.3d 892, 896 (4th Cir. 1995) (quoting 40 C.F.R. § 1508.9(a)).[4] An EA

---

[3]     Throughout this order, internal quotations and citations are omitted unless otherwise specified.

[4]     While these regulations were amended effective September 14, 2020, the parties agree that regulations in force prior to that date govern review of defendants' decision in this case, where defendants' actions commenced prior to that date. All citations to the regulations in this order are to the 2018 version of the regulations.

3

must include "brief discussions of [1] the need for the proposal, of [2] alternatives as required by [42 U.S.C. § 4332(2)(E)] of [3] the environmental impacts of the proposed action and alternatives, and [4] a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). As part of the process of preparing an EA, an "agency shall involve environmental agencies, applicants, and the public, to the extent practicable." 40 C.F.R. § 1501.4(b).

In determining whether an action is one "significantly" affecting the environment, an agency must consider the "degree to which the action may adversely affect endangered or threatened species . . . under the Endangered Species Act of 1973," 16 U.S.C. § 1531 et seq. ("ESA"), among other factors discussed in more detail in the analysis herein. 40 C.F.R. § 1508.27(a)(9). The ESA generally requires "all federal agencies to consult with the Secretary [of the Interior or its delegate, here, the National Marine Fisheries Service ('NMFS')] to 'ensure that any action authorized, funded, or carried out by such agency' is not likely to adversely affect a listed specie[s]" or its critical habitat. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 366 (2018) (quoting 16 U.S.C. § 1536(a)(2)). NMFS must then "provide the agency with a written statement ([a] Biological Opinion) explaining how the proposed action will affect the species or its habitat," and whether the action is "likely to jeopardize the continued existence of any endangered species or threatened species" or critical habitat. Bennett v. Spear, 520 U.S. 154, 158 (1997) (citing 16 U.S.C. § 1536(a) & (b)(3)(A)).

## STATEMENT OF FACTS

The administrative record in this case includes Corps and NMFS documentation of environmental impacts of dredging activities in the harbors of Morehead City and Wilmington, North Carolina, dating back to the late 1970s. The court summarizes first the prior documentation

4

in the record, followed by a description of the most recent NMFS biological opinion in the record and the decision under review.

A.    Prior Documentation

In May 1976, the Corps published an EIS for a proposed improvement of the harbor at Morehead City including deepening of an existing channel from 35 to 40 feet, as well as annual "maintenance" dredging.   (AR008753) (the "1976 EIS").[5]   The 1976 EIS recognizes that "processes of dredging, disposal of dredged material, nourishment of beaches, and deepening of the channel will all cause impacts" to ecological resources.  (AR008779).  At the same time, it states, such "impacts incurred . . . are considered to be minor," (id.), and "the benefits derived from the proposed action were judged to far outweigh the costs."  (AR008783).

In April 1977, the Corps published a similar EIS for maintenance dredging of the harbor at Wilmington.  (AR009409) (the "1977 EIS").  The 1977 EIS states that "[d]redging during times of high estuarine productivity (February through August) will generally be avoided." (AR009416).  Concerning adverse environmental impacts, the 1977 EIS notes: "[i]t would be impossible to avoid disruption of biotic communities within the dredged waterway." (AR009491). The 1977 EIS also rules out an alternative to abandon the project as infeasible, "[d]ue to the adverse economic impacts of this alternative."  (AR009496).

In 1989, the Corps published an EIS for "long-term maintenance" of Wilmington harbor. (AR008498) ("1989 EIS"), determining that "dredging may affect the right whale, shortnose sturgeon and . . . sea turtles," but "would not jeopardize the continued existence of the species," where employed with "mitigation measures."  (AR008592).  Among other measures, "[i]f hopper

---

[5]    All citations to the administrative record (abbreviated in citations as "AR") refer to page numbers stamped on the face of the documents commencing with "AR" and not the docket entry or page number, if any, supplied by the court's electronic case filing system, where the AR is filed on the docket.  (E.g., DE 17-37, 40-46, 48-2).

dredges are used, vessels should be adequately screened to document turtle or shortnose sturgeon mortalities," and "a watch will be instituted for the right whale." (Id.).

According to the 1989 EIS, a "hopper dredge is a self-propelled vessel resembling somewhat the modern ocean tanker in appearance . . . provided with hoppers used to load and carry material dredged hydraulically from the bottom." (AR008521). It is "designed primarily to hydraulically dredge materials, load and retain the solids in the hoppers, and then haul them to the disposal site where the material is disposed of by dumping through doors in the bottom of the hoppers." (Id.). "Loading is accomplished by sucking the shoal material into the hoppers through a drag head and pipe attached to the side of the vessel as it makes one or more cuts (or passes) through the dredging area." (Id.). The 1989 EIS also states that dredging is "normally scheduled to take place during the fall and winter months due to the concern over damaging or disrupting estuarine resources during biologically productive periods of the year." (AR008521). "[I]f possible, dredging is avoided from April 1 through September 30." (Id.).

The Corps published additional EAs and FONSIs during the period from 1983 to 2017, finding no significant impact for channel deepening, dredged material management plans, and additional improvements. (See AR000026-27). Several biological opinions provided by NMFS to the Corps in this time period contain additional assessments of the impacts of hopper dredging and recommended measures for minimizing impacts on wildlife, including a 1991 restriction on hopper dredging "to the months of December through March" in order to protect sea turtle species. (AR009584). A 1997 biological opinion states the Corps "has expressed a commitment to deploy hopper dredges during cold-water periods in channels with high sea turtle abundance or with substrates that render [a sea turtle] deflector ineffective," noted to include Wilmington harbor. (AR007333, AR007338). A March 2017 EIS by the Corps for Morehead City harbor dredge

material management notes that it "has been the Wilmington District's internal practice to minimize dredging impacts on sea turtles." (AR003822).

B.     2020 SARBO

A 2020 biological opinion by NMFS, "known as the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement in the Southeast United States (2020 SARBO)," states that it responds to the Corps's "request for consultation," first received in September 2008.  (AR002105, AR002119).  The "proposed action" covered by the 2020 SARBO (hereinafter, the "2020 SARBO proposed action") includes five types of activities, including, in pertinent part, "[m]aintenance dredging."   (AR002120).  With respect to timing, it states "[t]he proposed action as analyzed in this Opinion allows some flexibility in the timing of project completion through the use of a risk assessment and risk management process," under which "dredging will be allowed outside of the previously established seasonal dredging windows." (AR002174).

Concerning endangered or threatened species, the 2020 SARBO notes "there will be adverse effects to green . . . Kemp's ridley, and loggerhead sea turtles, and . . . sturgeon from entrainment or impingement due to hopper dredging," and that the 2020 SARBO proposed action is "likely to adversely affect" those species.  (AR002194, 2215).  However, it concludes that the 2020 SARBO proposed action is "not likely to jeopardize the continued existence of ESA-listed species or result in adverse effects to designated critical habitats."  (AR002105).  The 2020 SARBO also includes multiple detailed illustrations and diagrams regarding hopper dredging and its features, including the following depiction of a hopper dredge:



(AR002148). Likewise the 2020 SARBO illustrates recommended "Project Design Criteria" ("PDCs") including use of a "deflector" to protect sea turtles, (AR002635), illustrated as follows:



(AR002149), as well as "inflow screening" on the draghead (AR002634), illustrated as follows:



(AR002150).

C.       The Decision

The decision, published February 25, 2021, includes an initial four- page FONSI, followed by a 173-page EA, of which 89 pages comprise references and appendices.  (AR000009-185).  By way of overview, the FONSI includes a: 1) description of the "Proposed Action," (hereinafter the "Proposed Action"), 2) description of coordination with other agencies and the public, 3) statement of environmental impacts, and 4) determination and conclusion that the Proposed Action will result in no significant environmental impacts.  (AR000007-10).

The decision addresses "changes in the timing of maintenance dredging, using a hopper dredge, for the North Carolina State Ports' entrance channels to Wilmington and Morehead City" harbors.  (AR000007). The Proposed Action "consists of elimination of the historic dredging window (1 December – 15 April) so that dredging and bed leveling may occur at any time of year using a risk-based assessment approach."  (AR000007-8).  With respect to endangered or threatened species, the FONSI states that the Proposed Action "may affect but is not likely to

9

adversely affect: leatherback, loggerhead, hawksbill, Kemp's Ridley and green sea turtles; . . . right whales; . . . [and] sturgeon." (AR000009).

The FONSI attaches an EA (the "EA"), which includes sections containing 1) introduction and discussion of "purpose and need," 2) prior NEPA documents incorporated by reference, 3) analysis of alternatives, 4) description of the "affected environment and potential impacts," 5) discussion of "cumulative effects," 6) summary of compliance with environmental programs and statutes, and 7) a conclusion and appendices. (AR000012-185).

In its introduction, the EA describes reasons for a change in Corps policy:

> Previous analyses had assumed a hopper dredging window of 1 December to 15 April, while this analysis will consider the ability to use a hopper dredge any time of year. The current [2020 SARBO] calls for risk-based management of dredging rather than specific environmental windows for portions of these harbors. In addition, hopper dredge availability is limited, making it very challenging to maintain these harbors using the window previously analyzed. Eliminating the window will allow the use of the risk-based analysis and increase efficiency in maintaining the harbors while improving navigability and safety.

(AR000015. It further explains the decision's reliance on the 2020 SARBO as a basis for the Proposed Action:

> The [Corps] . . . completed the 2020 SARBO with [NMFS] in March 2020 changing how maintenance dredging and protection of [ESA]-listed species are managed. Historic seasonal dredging restrictions in the 1997 SARBO were solely focused on protection of sea turtles listed as threatened or endangered pursuant to the [ESA] (ESA-listed). The 1997 SARBO did not require seasonal dredging windows in North Carolina. The 2020 SARBO has replaced seasonal windows with a risk-assessment framework intended to optimize the dredging program along the southeast coast.

(Id.). In addition, it illustrates the geographic scope of the Proposed Action as follows for the Wilmington and Morehead City harbors:





(AR000019, AR000022).

In a discussion of "affected environment and potential impacts," the EA states that "[h]opper dredging and drag bar operations will continue to have known common effects that could potentially impact threatened and endangered species and their designated critical habitats," but that "[t]hese impacts are largely avoidable during maintenance dredging projects by adhering to Project Design Criteria (PDCs) applicable for . . . threatened and endangered species found within the project area as outlined in the 2020 SARBO." (AR000072). The EA further determines the Proposed Action may affect but is not likely to adversely affect all endangered or threatened species in the project areas. (AR000076-77). In conclusion, the EA highlights benefits of the Proposed Action and "minor and short-term impacts" to wildlife. (AR000095).

Additional details regarding the components of the decision and 2020 SARBO pertinent to the issues raised by the instant motions will be set forth in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "NEPA claims are subject to judicial review under the [APA], which permits a reviewing court to set aside an agency action if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" N. Carolina Wildlife Fed'n v. N. Carolina Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)).

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." Appalachian Voices v. United States Dep't of Interior, 25 F.4th 259, 269 (4th Cir. 2022). "Nevertheless, we must conduct a searching and careful review to determine

whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. An "agency's decision is arbitrary and capricious if it entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency." Sierra Club, Inc. v. United States Forest Serv., 897 F.3d 582, 594 (4th Cir. 2018).

"A reviewing court must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action, and must not reduce itself to a 'rubber-stamp' of agency action." N. Carolina Wildlife Fed'n, 677 F.3d at 601. Under this standard, the "reviewing court may look only to the agency's contemporaneous justifications for its actions." Appalachian Voices, 25 F.4th at 269. Although the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), the court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

B.    Analysis

Plaintiffs argue that the decision must be set aside as arbitrary and capricious, under both the APA and NEPA, because of its failures to provide a rational explanation and sufficient analysis of multiple NEPA factors bearing on whether to prepare an EIS. For the following reasons, the court agrees that defendants' evaluation of certain NEPA factors was inadequate, and that the decision must be vacated on the terms set forth herein.

NEPA regulations are "intended to guide federal agencies in ascertaining the likelihood that their actions will, within the meaning of NEPA, significantly affect the environment." Friends of Back Bay v. U.S. Army Corps of Engineers, 681 F.3d 581, 584 (4th Cir. 2012). "[T]he policy

goals underlying NEPA are best served if agencies err in favor of preparation of an EIS when there is a substantial possibility that the proposed action may have a significant impact on the environment." Id. at 590. "[W]hen it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared." Id.

In determining whether a proposed action may have a significant impact on the environment, "[d]ecisionmakers are required to consider both context and intensity, with the latter criterion 'referring to the severity of impact.'" Id. at 589 (quoting 40 C.F.R. § 1508.27(b)). "The regulation[s] detail[] ten intensity factors to be considered," id. of which the plaintiffs direct the court's attention to five they believe support the conclusion that the decision is arbitrary and capricious.

Those factors are: 1) "[t]he degree to which the action may adversely affect an endangered or threatened species," 40 C.F.R. § 1508.27(b)(9); 2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," id. at § 1508.27(b)(4); 3) "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," id. at § 1508.27(b)(6); 4) "[w]hether the action is related to other actions with . . . cumulatively significant impacts," id. at § 1508.27(b)(7); 5) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," id. at § 1508.27(b)(5).

"A court examining the sufficiency of an agency's environmental analysis under NEPA must determine whether the agency has taken a 'hard look' at an action's environmental impacts." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 185 (4th Cir. 2005). "At the least, . . . [this] encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." Id. "[A]gencies must assure that

the adverse environmental effects of the proposed action are adequately identified and evaluated." Id.

1.        Endangered and Threatened Species

        a.        Sea Turtles and Sturgeon

In this case, the decision lacks a rational connection between the facts found and the determinations made in addressing the "degree to which the action may adversely affect . . . endangered or threatened species" of sea turtles and sturgeon. 40 C.F.R. § 1508.27(b)(8). In particular, the decision states that the "Proposed Action is covered . . . by the 2020 [SARBO]," and that the "EA utilizes the 2020 SARBO." (AR000008, 77). In turn, the 2020 SARBO determines that the activity considered in the Proposed Action, including hopper dredging and relocation trawling with no seasonal windows, is "likely to adversely affect" six listed endangered or threatened sea turtles and six listed sturgeon. (AR002194; see AR002195 (using acronym "LAA" to signify "likely to adversely affect"); AR002213; AR002174) (emphasis added). It further finds that "there will be adverse effects to . . . sea turtles, and . . . sturgeon from entrainment or impingement due to hopper dredging." (AR002215) (emphasis added).

By contrast, in conflict with these findings in the 2020 SARBO, the FONSI determines that the proposed action "may affect but is not likely to adversely affect: leatherback, loggerhead, hawksbill, Kemp's Ridley and green sea turtles," along with sturgeon and their critical habitats. (AR000009) (emphasis added). In addition, the EA includes a table that determines the proposed action may affect but is not likely to adversely affect all such endangered or threatened species in the project areas, designated by a shorthand acronym "MANLAA." (AR000076-77; see AR002195 (explaining meaning of acronym "MANLAA")). It also finds that the Proposed Action "may result in minor and short-term impacts" to wildlife and critical habitat. (AR000095). Based

16

on these determinations, the FONSI concludes that the Proposed Action "would result in no significant environmental impacts." (AR000010).

Critically, neither the FONSI nor the EA examines sufficiently this material conflict between the findings in the 2020 SARBO and the decision. Because the decision proceeds on the determination that the Proposed Action is not likely to adversely affect any endangered or threatened species, it "fail[s] to consider an important aspect of the problem [and] offer[s] an explanation for its decision that runs counter to the evidence before the agency." Sierra Club, 897 F.3d at 594. As such, the decision also is not "based on a consideration of the relevant factors," id., and it does not "examine[] the relevant data and articulate[] a satisfactory explanation for its action." N. Carolina Wildlife Fed'n, 677 F.3d at 601. In addition, because of the same conflict, the decision does not provide assurance that the Corps "has taken a 'hard look' at an action's environmental impacts," at least encompassing "investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." Nat'l Audubon Soc'y, 422 F.3d at 185. For each of these reasons, the court is compelled to hold that the "decision is arbitrary and capricious." Sierra Club, 897 F.3d at 594.

Defendants' arguments to the contrary are unavailing. In addressing the conflicting statements in the decision, defendants argue that "the FONSI incorrectly labeled effects to several ESA-listed sea turtles and sturgeon as 'may affect but is not likely to adversely affect.'" (Defs' Reply (DE 52) at 13 n. 5) (emphasis in original)). Defendants characterize this as a "misstatement of the ESA finding." (Id.). This is, however, a "post-hoc rationalization[]" and explanation of these findings in the FONSI and EA, on which this court cannot rely. Appalachian Voices, 25 F.4th at 269. Nothing in the FONSI and EA themselves provide any indication that subject statements were not, in fact, defendants' own determinations. Indeed, the fact that defendants

17

made the subject statements in <u>both</u> the FONSI and the EA, and the fact that the statements are not purporting to quote or summarize findings the 2020 SARBO, bely defendants' post-hoc characterization. For example, the statement in the FONSI that the Proposed Action "is not likely to adversely affect" endangered species does not reference either the 2020 SARBO or the ESA, but rather the NEPA "factors." (AR000009). The table in the EA with the same finding likewise presents as the Corps's own "Threatened and Endangered Species Effects Determination." (AR00076).

Additional contemporaneous statements by defendants, included in appendices to the EA, further point to the deliberate nature of defendants' findings. In a letter to the North Carolina Division of Coastal Management ("DCM"), defendants state: "Based on the temporary nature of the work and short-term duration of the project, environmental impacts are expected to be minimal," and "[i]t is believed that the proposed project <u>will not likely adversely affect</u> . . . <u>federally listed species or their critical habitat</u>." (AR000102 (emphasis added)). In another letter to DCM, defendants state: "The proposed action <u>will not adversely affect any biota</u> recognized by the State as species of concern." (AR000163) (emphasis added). In the draft EA, defendants also state the proposed action "is not likely to adversely affect" sea turtles and sturgeon. (AR001912). All of these statements directly contradict the "likely adverse[] [e]ffect" determinations in the 2020 SARBO. (AR002194).

Looking to what is actually stated in the decision, as opposed to counsel's post hoc rationalization in this context is "particularly appropriate given that NEPA emphasizes the importance of an open and public environmental assessment process." <u>N. Carolina Wildlife Fed'n</u>, 677 F.3d at 604. "Clarity is at a premium in NEPA because the statute is a democratic decisionmaking tool," and "agencies violate NEPA when they fail to disclose that their analysis

contains incomplete information." Id. at 603. Accordingly, defendants' attempt to rationalize or explain its determination is without merit.

Defendants also point to other passages in the EA that they contend show that the decision acknowledges "potential adverse effects to sea turtles and other species," thereby suggesting that the decision is consistent with the findings of the 2020 SARBO. (Defs' Reply (DE 52) at 13 n.5). This contention is unavailing for two reasons. First, it is again a post hoc rationalization, improper for consideration upon judicial review of the decision. See Appalachian Voices, 25 F.4th at 269. Second, the premise of defendants' contention is flawed. Nothing in the decision itself demonstrates that defendants considered, with the requisite "clarity" and "open and public . . . assessment process," 677 F.3d at 603-604, the specific findings in the 2020 SARBO that the activity covered by the Proposed Action is "likely to adversely affect" endangered species. (AR002194-2195). Remarkably, neither the FONSI nor the EA ever quotes such language directly.

Defendants attempt to characterize other references in the decision as equal to a recognition of a likely adverse effect on endangered species. These are, at best, a stretch even in the context of an impermissible post hoc explanation. For example, defendants cite to a passage in the EA, which they contend "note[s] [the] likelihood that removal of seasonal window could increase encounters between dredges and protected species." (Defs' Reply (DE 52) at 13 n.5 (citing AR000086)). As an initial matter, this is not what the EA says at that page. Rather, it states: "Eliminating the historic window . . would have a minimal effect on marine species," and that "increased encounters with the dredge and more individuals affected by dredging is expected, however minimal." (AR000086) (emphasis added). In any event, no matter how characterized, this is not equivalent to a determination that the Proposed Action would "likely adversely affect"

19

endangered species.  (AR002194).  If it was intended as equivalent, much more explanation is required to meet the NEPA standard.  See N. Carolina Wildlife Fed'n, 677 F.3d at 604.

Defendants also argue that the "underlying analysis" in the 2020 SARBO supports the determination of "no significant impact" in the decision, despite any findings in the 2020 SARBO of a "likely adverse[] [e]ffect" on endangered species.  (Defs' Reply (DE 52) at 14).  This argument, too, is flawed on multiple levels.  As an initial matter, it misses the point that, in applying this factor, defendants must consider the "degree to which the action may adversely affect an endangered or threatened species," 40 C.F.R. § 1508.27(b)(8), which language aligns directly with the determination made in the 2020 SARBO that the action is "likely to adversely affect . . . ESA-listed species."  (AR002194-2195) (emphasis added).  Second, defendants' argument again invites the court to engage in post hoc characterization, this time concerning the meaning of other passages in the 2020 SARBO, where the decision does not engage in that analysis in the first place.  Third, and relatedly, the passages cited by defendants do not necessarily have the significance defendants attribute to them.

For example, defendants point to the observation in the 2020 SARBO that "'the take considered in [the SARBO] will result in impacts that are similar to those that have been occurring to the populations of [the relevant] species over decades'" due to the maintenance dredging that has long "'been ongoing in the action area.'"  (Defs' Reply (DE 52) at 14) (quoting AR002482)). Defendants then provide a litigation-based interpretation of this observation: "In other words, NMFS concluded that removal of static seasonal windows and replacement of those windows with risk-based assessments throughout the entire South Atlantic region would not meaningfully increase adverse impacts to the species overall."  (Id. (emphasis added)).  This interpretation is not present in the 2020 SARBO.  In fact, this passage in the SARBO plausibly could be read instead

only to suggest that the mechanical activity of dredging in the summer is similar, in terms of the physical interaction with wildlife, as it is in the winter. It does not address an "increase" in adverse impacts to endangered species resulting from the proposed action, but rather only whether the proposed action would "jeopardize the continued existence" of the species. (AR002481).

At bottom, defendants suggest the "no jeopardy" conclusion in the 2020 SARBO is "consistent with" and more relevant to the NEPA analysis in the decision. (Defs' Reply (DE 52) at 14; see Defs' Mem. (DE 50) at 30). This suggestion, however, is belied by the structure and logical steps set out in support of the conclusion in the FONSI. In particular, in its "determination" section, the FONSI states that the Proposed Action "does not constitute a major Federal action significantly affecting the quality of the human environment." (AR000009). Notably, the FONSI does not cite to NMFS's "no jeopardy" conclusion in support of this proposition, but rather states that it is based on NEPA "factors," one of which is that "[t]he proposed action may affect but is not likely to adversely affect" endangered species. (Id.).

Cases cited by defendants involving an agency's reliance on biological opinions are instructively distinguishable because they do not examine biological opinions finding a proposed action will "likely adversely affect" multiple endangered species, in conflict with findings in a NEPA decision, as here. See, e.g., Env't Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1010–11 (9th Cir. 2006); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 540 (11th Cir. 1996); Altamaha Riverkeeper v. United States Army Corps of Engineers, 355 F. Supp. 3d 1181, 1193 (S.D. Ga. 2018). Notably, by contrast, the Ninth Circuit in a later case held that a biological opinion's findings of "likely to adversely affect" endangered species "by its own terms makes clear

21

that [a proposed action] may 'significantly' affect the environment." Nat. Res. Def. Council, Inc. v. Winter, 518 F.3d 658, 692 (9th Cir.), rev'd on other grounds, 555 U.S. 7 (2008).[6]

In sum, the decision fails to provide "a rational connection between the facts found and the choice made" concerning its evaluation of the degree to which the action may adversely affect endangered or threatened species of sea turtles and sturgeon. State Farm, 463 U.S. at 43. Either the decision conflicts in material respects with the 2020 SARBO, or the decision contains a substantial error in describing impacts on those endangered or threatened species. In either event, the decision "fail[s] to consider an important aspect of the problem," Sierra Club, 897 F.3d at 594, and it fails to take a "'hard look' at [the] action's environmental impacts." Nat'l Audubon Soc'y, 422 F.3d at 185. Therefore, the "decision is arbitrary and capricious" and the court must "vacate th[e] decision" on that basis alone. Sierra Club, 897 F.3d at 594 & 606; see Friends of Back Bay, 681 F.3d at 589.

b.     Right Whale

In addition to the foregoing deficiencies, the decision also "fail[s] to consider an important aspect of the problem [and] offer[s] an explanation for its decision that runs counter to the evidence before the agency," pertaining to the right whale. Sierra Club, 897 F.3d at 594. The decision relies in numerous instances on the benefits of reducing risks to the right whale as a basis for removing seasonal dredging windows in the Wilmington and Morehead City harbors. (See AR000024, 29, 35, 48, 69, 73, 76, 83, 142). It reasons that "[b]ecause the [Right Whale] Conservation Plan is part of the [2020] SARBO, which the [Corps] must abide, . . . it calls for avoidance of work in the area

---

[6]     Defendants contend that the Ninth Circuit's decision in Winter is "no longer good law." (Defs' Reply (DE 52) at 15 n. 6.). However, the Supreme Court reversed the Ninth Circuit on other grounds in Winter, and it expressly did not address the Ninth Circuit's determination on the merits. See 555 U.S. at 23-24. In any event, the court need not, and does not, rely upon Winter for the proposition that the 2020 SARBO's findings require preparation of an EIS as a matter of law. Rather, the court cites to Winter to further distinguish those cases cited by defendants and as a case that further calls into question the validity of defendants' reasoning here.

when [right whales] are present." (AR000072). "If hopper dredging were to occur more frequently during the warmer months (May-November)," it states, "there would be less likelihood of injuries occurring from ship strikes to the [right whale] during the time that they are more frequently seen within the critical habitat area for calving." (AR000073).

This determination is in conflict with the evidence before the agency as it pertains to the Morehead City harbor. In particular, the decision states that the Right Whale "critical habitat area [is] located just east of the Cape Fear River off of the W[ilmington] H[arbor] project and south towards Cape Canaveral." (AR000069) (emphasis added). The decision includes a map, which depicts the Right Whale critical habitat extending only to "Cape Fear" and not further north, where Morehead City harbor is located:



(AR000070). Neither the decision nor the 2020 SARBO include evidence or figures showing that dredging in Morehead City harbor would have any impacts, beneficial or adverse, on the right whale.

Thus, according to the record before the court, one of the central and prominent reasons for the decision does not on its face apply to Morehead City. At the very least, the decision lacks an appropriate examination into whether right whale concerns apply equally to Wilmington and Morehead City, or whether the two locations should be evaluated separately concerning impacts to the right whale.

Accordingly, the decision "fail[s] to consider an important aspect of the problem [and] offer[s] an explanation for its decision that runs counter to the evidence before the agency." Sierra Club, 897 F.3d at 594. As such, the decision also does not "examine[] the relevant data and articulate[] a satisfactory explanation for its action." N. Carolina Wildlife Fed'n, 677 F.3d at 601. In this manner, defendants "violate NEPA when they fail to disclose that their analysis contains incomplete information" as it pertains to the right whale at Morehead City harbor. Id. at 603. Therefore, for this additional reason, the decision must be "vacat[ed] as "arbitrary and capricious." Sierra Club, 897 F.3d at 594 & 606.

2.      Highly Uncertain

NEPA requires defendants to consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 1508.27(b)(5). As an initial matter, because the decision contains conflicting statements about the potential likely adverse effects of hopper dredging on endangered species, the decision necessarily also lacks clarity and adequate explanation regarding the degree of certainty of the possible effects on the environment.

In addition, and independently of that flaw, the decision fails to examine the significance of multiple uncertain effects of the proposed action. First, the effects of the proposed action are uncertain because the decision provides no indication, for any given year, when hopper dredging will occur. The decision states, "it should not be assumed that hopper dredging will necessarily occur within the spring and summer months," but instead "hopper dredging would occur when a hopper contract dredge is available and not confine dredging impacts to any particular time of year." (AR000085). While the decision does not confine dredging to any particular time of year, this feature leaves open the possibility that hopper dredging will take place every year in a season with high likelihood of adverse impact on endangered species, because this is the only time when a "hopper contract dredge is available." (AR000085).

Second, the effects of the proposed action are uncertain because the decision relies upon the imposition of "risk-based management approach" and "PDCs" to protect endangered species, the features of which at any particular time and place are variable. (AR000031, 72). As described in the decision, this approach relies upon balancing a number of competing needs, which are not susceptible to prediction at the time of the decision. For instance, the decision states: "[r]isk assessment for the 2020 SARBO is not a static decision, but instead an ongoing process that take into account historic information, project detail decisions made pre-construction, adjustments made during construction, and a post-construction assessment of lessons learned to document an evolving understanding of the project area, species and habitat, and risk associated with these projects." (AR000016) (emphasis added). The decision also states that "adjustments may be made in the future" using "adaptive management practices." (AR000086).

Compounding this uncertainty, two PDCs outlined in the 2020 SARBO, "inflow screening" and use of a "deflector that is attached to the draghead," (AR002633-34) are

"ineffective" in the Wilmington harbor due to the presence of "substrates" and "woody debris." (AR002434, 7333, 7338). Another, "relocation trawling," (AR002636), itself is "likely to adversely affect" turtles, (AR002195), and its use depends upon whether it is "deemed appropriate to minimize the risk of lethal take on a project." (AR002636). Based on these descriptions, it is uncertain how the risk-based management approach and PDCs will be used in any given decision to proceed with dredging, particularly at Wilmington harbor.

Third, the effects of the proposed action are uncertain because, as the decision expressly recognizes, "[i]t is difficult to predict the increase in take due to spring and summertime dredging." (AR000073). Rather than engage thoroughly in this "difficult" prediction process, the decision suggests that it relies upon a shorthand by looking to a small sample of information. (Id.). For example, the decision discusses only four years of data regarding sea turtle takes in the project area. (AR000074). Reflecting the uncertainty of the effects of the proposed action, the decision also states that "[a]n Interagency Team has been developed to continue coordination and monitor/assess environmental effects of hopper dredging for the next 3 years," with the "goal of monitoring [being] to learn more about the potential impacts of dredging during warmer months of the year." (AR000008, 89). While identifying these uncertainties, the decision nonetheless concludes without explanation that an EIS is not required. (AR000008-10).

Fourth, the effects of the proposed action are uncertain because of multiple indirect and cumulative impacts that are unpredictable. In particular, decision states that "[i]t is not known how many future private or federal projects may be performed during warmer months of the year and it's beyond the scope of this EA to attempt to predict what time of year future projects may be accomplished and any attempt to do so would be speculative, at best." (AR000086). It notes that "[i]t is also possible that future hopper dredging will occur in the warmer months more frequently,

therefore, increased effects on marine species is expected to occur." (AR000086). It further notes that "[i]n the past 5 years, more non-federal hopper dredging projects have occurred along the NC coast" taking place in the summer months, and "[t]he future may see an increase in demand for hopper dredging, as more and more federal and non-federal beach projects get underway." (AR000083-84).

For each of the foregoing uncertainties, the decision fails to examine why they do not individually and in combination create "highly uncertain" or "unique or unknown" possible effects on the environment as a factor in the analysis of whether to prepare an EIS. 40 C.F.R. 1508.27(b)(5). In fact, the decision does not evaluate at any point expressly this NEPA factor, providing no basis by which "the agency's path may reasonably be discerned" on its consideration of whether the degree of uncertainty requires preparation of an EIS. Bowman Transp., 419 U.S. at 286. In this manner, the decision "fail[s] to consider an important aspect of the problem [and] offer[s] an explanation for its decision that runs counter to the evidence before the agency." Sierra Club, 897 F.3d at 594.

Defendants argue nonetheless that "some quotient of uncertainty is always present when making predictions about the natural world," citing American Wild Horse Campaign v. Bernhardt, 963 F.3d 1001, 1008 (9th Cir. 2020). (Defs' Mem. (DE 50) at 42). The combination of uncertainties identified above, however, is more than "some quotient of uncertainty" appearing on the face of the decision. In this respect, American Wild Horse Campaign is distinguishable because it does not address such a combination of uncertainties. There, the court addressed the Bureau of Land Management's "plan to geld and release male horses to the range," noting "[g]elding horses is not a new practice, and its effects are well understood." 963 F.3d at 1008. While the agency decision acknowledged that "few studies . . . have investigated their behavior in

free-roaming populations," the court was satisfied that the agency sufficiently "used the existing research to predict that those effects likely would be insignificant." Id. The same cannot be said here, given the combination of recognized uncertainties related to removing long-standing seasonal windows.

Defendants also argue that "[a]bsent actual data from dredging outside the historical windows, further study would not resolve" the uncertainty involved in predicting future outcomes. (Defs' Mem. (DE 50) at 42). "[W]here further study is unlikely to be productive," they argue, "an EIS is not required," citing Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1275 (10th Cir. 2004). This argument is unavailing on multiple levels. First, the decision itself does not provide the explanation that defendants now offer for foregoing an EIS despite uncertainties identified in the decision. It does not state, for example, that there is a lack of actual data from dredging outside the historical window or that further study would not resolve the uncertainties identified in the decision. Rather, it states that "[i]t is difficult to predict." (AR000073).

Second, there is substantial additional evidence in the record, not addressed in the decision, that could be the subject of more robust analysis regarding potential effects on wildlife of removing seasonal windows on dredging. For example, the Corps recognized in its own internal assessment that "[s]ince 2000, only one sea turtle was killed (19 March 2003) when dredging during this 1 January to 31 March timeframe," while "[i]n 2002, a total of 5 sea turtles were killed during a permitted hopper dredging project in Bogue Banks that did not adhere to this window." (AR005141). The Corps also maintains an Operations and Dredging Endangered Species System ("ODESS") "Management Tool" that documents, for example, takes from hopper dredging during the time period from to 1997 to 2020. (E.g., AR003018, 7323). The 2020 SARBO discusses data on takes from hopper dredging during the time period 1998-2018. (AR002214). Likewise,

comments by state agencies and organizations provide additional data on a wider time frame. (See, e.g., AR001054 (National Audubon Society comment stating "[o]f the 47 instances of take between 1994-2020 at Morehead City and Wilmington Harbors, 72% (34) exceeded the window"); AR000705 (North Carolina Wildlife Resources Commission comments noting "[m]ovements of juvenile sea turtles in the lower Cape Fear River has . . . been tracked and published by . . . UNC-Wilmington (Snoddy et al. 2010).")).

Third, Greater Yellowstone Coalition is instructively distinguishable. There, existing biological opinions before the agency "could not predict with certainty how the resident bald eagles would react to the Canyon Club development" subject of a proposed action. 359 F.3d at 1276. Critically, "[i]t appear[ed] this uncertainty stemmed not from a lack of thoroughness in investigating potential impacts but primarily from the fact that responses of eagles to human disturbances vary depending on the eagle individual/pair." Id. In the instant case, by contrast, the former appears to be true, based upon the present explanation in the decision. Effects on endangered species are uncertain as described in the decision, but that uncertainty may be resolved by more thorough investigation.

In sum, the decision fails to address sufficiently the degree to which the possible effects of the proposed action on the environment are highly uncertain. Absent examination of the significance of the uncertainties identified herein, the decision "fail[s] to consider an important aspect of the problem [and] offer[s] an explanation for its decision that runs counter to the evidence before the agency." Sierra Club, 897 F.3d at 594. Therefore the decision must be vacated for this additional reason.

3.    Additional NEPA Factors and Arguments

Having determined that the decision must be vacated due to a failure to adequately address impacts on endangered species and highly uncertain effects on the environment, the court need not address additional NEPA factors and arguments raised by plaintiffs. See N. Carolina Wildlife Fed'n, 677 F.3d at 605 n.5. While some of the additional NEPA factors necessarily are impacted by the aforementioned deficiencies in the decision,[7] and while plaintiffs' remaining arguments raise important issues for consideration in any future action by the Corps, the court finds that they do not provide an independent basis for vacating the decision.[8]

4.    Remedy

Plaintiffs argue that the court should "order the preparation of a full EIS" due to the deficiencies asserted in their complaint. (Pls' Mot. (DE 48) at 46). For their part, defendants argue that if the court rules in favor of plaintiffs, "an order requiring an EIS should not be a presumed remedy under the circumstances here," and that remand to defendants for "further environmental review and reconsideration of the finding of no significant impact" is warranted. (Defs' Mot. (DE 50) at 55). The court agrees with defendants.

Generally, the decision whether to prepare an EIS is left for an agency to decide in the first instance. See State of N.C. v. F.A.A., 957 F.2d 1125, 1128 (4th Cir. 1992) ("An agency must prepare an [EA] in order to determine whether an [EIS] is necessary."). In reviewing this decision,

---

[7]    For example, because the decision does not address sufficiently the degree of direct impacts on endangered species, then necessarily it fails to address adequately indirect and cumulative impacts on those species. 40 C.F.R. § 1508.27(b)(7). Likewise, absent adequate discussion of effects on endangered species, the analysis is insufficient to discern the nature and degree of precedent set by the decision. Id. § 1508.27(b)(6).

[8]    In so holding, the court does not consider pertinent to the foregoing analysis additional evidence in the form of meeting notes introduced by plaintiffs in support of their motion to complete or supplement the administrative record. (See DE 54-3 at 5). Where the decision must be vacated, any future actions by defendants will require compilation of a new record. In addition, where the meeting notes reflect comments by an individual staff member of the Corps, which are themselves ambiguous, the court does not find them appropriate for completing or supplementing the record. Therefore, plaintiffs' motion to complete or supplement the administrative record is denied.

the "court is not empowered to substitute its judgment for that of the agency." Id. Accordingly, once the court determines that the decision is "arbitrary and capricious," as it has done here, the decision is "vacate[d]," and the matter should be remanded to the agency for further consideration. See Sierra Club, 897 F.3d at 594 & 606; see, e.g., Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("Because the question of whether the project may have significant adverse impacts is one that the [agency] must decide, the appropriate remedy is to remand the case to the agency to correct the deficiencies in the record and in its analysis."). Such further consideration may involve preparation of another EA or an EIS, or it may result in a modification of the proposed action. See id.

In some circumstances, as the parties recognize, courts have remanded to an agency with directions to prepare an EIS. For example, in Friends of Back Bay, after "invalidat[ing]" a FONSI as "arbitrary and capricious," the court "remand[ed] to the Corps for preparation of an EIS, and for such other and further proceedings as may be appropriate." 681 F.3d at 590. In that case, the court recognized that the Fish and Wildlife Service specifically recommended preparation of an EIS as an alternative to denying [a] permit," and the court stated "we agree that is the preferred approach here." Id.

Courts have recognized that a remand with directions to prepare an EIS may be warranted based upon the nature and extent of inadequacies in the NEPA decision under review. For example, one court has reasoned:

> If the court finds that the project may have a significant impact, the court should order the agency to prepare an EIS. If the court finds, on the other hand, that the EA is inadequate in a manner that precludes making the determination whether the project may have a significant impact, the court should remand the case to the agency to correct the deficiencies in its analysis.

O'Reilly v. U.S. Army Corps of Engineers, 477 F.3d 225, 239 (5th Cir. 2007); see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1226 (9th Cir. 2008)

("[I]f there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate EA, the court should ordinarily remand for the agency to either prepare a revised EA or reconsider whether an EIS is required.").

In this case, a remand for further consideration rather than a remand with directions to prepare an EIS, is appropriate due to a combination of circumstances. First, the court is mindful of the general rule that the "court is not empowered to substitute its judgment for that of the agency," State of N.C., 957 F.2d at 1128, and, unlike in Friends of Back Bay, no federal agency has "specifically recommended preparation of an EIS." 681 F.3d at 590. Second, the errors identified herein, while serious deficiencies, involve insufficient explanation and examination of conflicts and NEPA factors, rather than a determination by the court of significant impacts. Third, two summer seasons have passed since the issuance of the FONSI in February 2021, and there may be new data from summer dredging activities since that time, as well as updates on other projects bearing upon cumulative impacts, that may impact whether to prepare an EIS. (See, e.g., Shoemaker Decl. (DE 58-1) ¶ 2 (noting anticipated dredging to complete by July 19, 2022, at Morehead City)).

Therefore, remand with directions to prepare an EIS, as requested by plaintiffs, is not warranted. Rather, it is appropriate to remand to defendants for further consideration consistent with this order.

5.      Additional Requests for Relief

The complaint requests additional forms of relief that are not addressed the parties' summary judgment motions. For example, the complaint requests that the court "[g]rant appropriate injunctive relief," and to "[i]ssue a declaratory judgment stating that the Corps has

32

violated the APA and NEPA in the respects" asserted by plaintiffs. (DE 1 at 31). However, where the court has determined that the decision must be vacated as arbitrary and capricious, the court finds that no further injunctive or declaratory relief is appropriate.

In addition, plaintiffs request an award of costs and attorneys' fees. Where the parties have not briefed such issues, and these issues may be resolved post-judgment, see Fed. R. Civ. P. 54(d), the court directs further briefing according to the schedule set forth in the conclusion.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment (DE 47) is GRANTED and defendants' motion for summary judgment (DE 49) is DENIED. Defendants' decision under review is VACATED as arbitrary and capricious, and the matter is REMANDED to defendants for further consideration consistent with this order. Plaintiffs' motion to complete or supplement the administrative record (DE 53) is DENIED. The clerk is DIRECTED to close this case.

Plaintiffs are DIRECTED to file motion(s), if any, concerning their requests for costs and fees, within 21 days of the date of this order. Defendants may file response(s) with 21 days thereof, and plaintiffs may reply, if at all, within 14 days of defendants' response. Thereupon, the court will enter such further order(s) regarding costs and fees as is warranted.

SO ORDERED, this the 26th day of September, 2022.

LOUISE W. FLANAGAN
United States District Judge

# Glossary

**APA** – Administrative Procedure Act, 5 U.S.C. §§ 701-706.

**AR** – Administrative Record

**Corps** – defendant United States Army Corps of Engineers.

**DCM** – North Carolina Division of Coastal Management.

**Decision** – defendants' decision under review, titled "Wilmington Harbor and Morehead City Harbor Maintenance Dredging and Bed Leveling Final Environmental Assessment and Finding of No Significant Impact," dated February 25, 2021, located at AR000007-185.

**EA** - Environmental Assessment, specified by NEPA regulations, 40 C.F.R. § 1508.9. The EA in the decision in this case is located at AR000012-185.

**EIS** – Environmental Impact Statement, specified by NEPA, 42 U.S.C. § 4332.

**ESA** – Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq.

**FONSI** – Finding of No Significant Impact, specified by NEPA regulations, 40 C.F.R. § 1508.13. The FONSI in the decision in this case is located at AR000007-10.

**LAA** – likely to adversely affect.

**MANLAA** – may affect but is not likely to adversely affect.

**NEPA** – National Environmental Policy Act, 42 U.S.C. §§ 4321-4347.

**NMFS** – National Marine Fisheries Service.

**PDCs** – Project Design Criteria.

**Proposed Action** – the proposed action in the decision, comprising "elimination of the historic dredging window (1 December – 15 April) so that dredging and bed leveling may occur at any time of year using a risk-based assessment approach." (AR000007-8).

**SARBO** – South Atlantic Regional Biological Opinion by NMFS.